**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
──────────────────────────────────────────── x

KEITH SHAFFER,

          Plaintiff,

   -against-                                   24 Civ. 6067 (CM)(SLC)

FAIRDINKUM CONSULTING, LLC, et al.,

          Defendants.
──────────────────────────────────────────── x

USDC SDNY
DOCUMENT
ELECTRONIC
DOC #:
DATE FILED: 9/5/25

## ORDER

    Plaintiff Keith Shaffer brings an action under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* (the "ADA"), the New York State Human Rights Law, NY State Executive Law § 296, *et seq.* (the "NYSHRL"), the New York City Human Rights Law, NYC Administrative Code § 8-107, *et seq.* (the "NYCHRL"), and common law breach of contract against corporate defendants Fairdinkum Consulting, LLC and Fairdinkum Management Holdings LLC (together the "Fairdinkum Defendants") and individual defendants David Hafke and Michael Lianos (collectively with the Fairdinkum Defendants, the "Defendants"). (Dkt. No. 7 (the "Amended Complaint" or "Am. Compl.") ¶¶ 1, 10-18). This action follows Defendants' alleged discriminatory termination of Plaintiff's employment, failure to provide Plaintiff with a reasonable accommodation for his disabilities, and failure to provide certain disbursements in connection with Plaintiff's membership interests in Fairdinkum Management Holdings LLC.

    Plaintiff first brought this action on August 9, 2024, (Dkt. No. 1), and filed an Amended Complaint on August 27, 2024, (Dkt. No. 7). Defendant Fairdinkum Management Holdings LLC (the "Company") filed a motion to dismiss the Amended Complaint on November 15, 2024. (Dkt.

No. 18). Defendants Fairdinkum Consulting, LLC, David Hafke, and Michael Lianos filed an Answer to the First Amended Complaint on November 17, 2024 (Dkt. No. 19).

On July 31, 2025 – well after briefing concluded on the Company's Motion to Dismiss, and long after the January 3, 2025 deadline to amend pleadings or join parties had passed – Plaintiff brought a Motion for Leave to File a Second Amended Complaint. (Dkt. No. 46).

I conclude that Plaintiff's Motion for Leave to File a Second Amended Complaint should be DENIED. Defendant's Motion to Dismiss, construed as a Motion to Compel Arbitration, is GRANTED with respect to Plaintiff's fourth cause of action for breach of contract and is otherwise DENIED. Litigation on the Fourth Cause of Action – but only on the Fourth Cause of Action – will be STAYED pending the conclusion of any arbitration.

## BACKGROUND

The well-pleaded allegations of the Complaint are accepted as true.

Plaintiff claims that he began his employment with "Defendants" in or around 2005.[1] (Am. Compl. ¶ 19). He transitioned to remote work in March 2020 at the start of the COVID-19 pandemic. (*Id.* ¶ 21). At some point during the 2021, Defendants implemented a vaccine mandate. (*See id.* ¶ 22). Plaintiff alleges that, in August 2021, he provided Defendants with a doctor's note, stating that he was being treated for angioedema and acute pericarditis and recommending that he not receive the COVID-19 vaccine. (*Id.* ¶ 23). Defendants allegedly agreed to this and allowed Plaintiff to continue working remotely. (*Id.* ¶ 26). However, Plaintiff alleges that, on or about

---

[1] Plaintiff uses "Defendants," the "Fairdinkum Defendants," and the individual names of the corporate defendants interchangeably throughout the Complaint, and contends that Fairdinkum Consulting, LLC and Fairdinkum Management Holdings LLC are "'integrated employers' as they have common management, share financial control of both companies, share centralized control of labor relations, and share employees." (Am. Compl. ¶ 12).

December 13, 2021, without raising any issues regarding Plaintiff's performance or his purported inability to perform essential job duties, the Fairdinkum Defendants removed Plaintiff's accommodation and suspended his employment purportedly "due to what [Fairdinkum] deem[ed] to be [his] inability to perform account manager duties in the strictly remote capacity in which [he] was currently restricted." (*Id.* ¶ 27). Plaintiff alleges that Defendants discriminated against his disability through this termination for the following reasons: (i) Plaintiff was able to fully perform his job duties from home; (ii) Defendants refused to explain the specific duties he was unable to perform; and (iii) Defendants failed to work with Plaintiff to determine an alternative accommodation that would have enabled him to continue working in his position. (*Id.* ¶¶ 29-32). Plaintiff does not allege whether Defendants ever demanded that he receive the COVID-19 vaccine in order to lift his suspension. Instead, Plaintiff alleges only that on or about January 13, 2022, Defendant Hafke sent an email terminating his employment. (*Id.* ¶ 33). Plaintiff alleges, in his first three causes of action, that this constituted disability discrimination under federal, state, and New York City law.

In a fourth cause of action, Plaintiff alleges that, incident to his employment with the Fairdinkum Defendants, he held a 9.722% interest in the Company. (*Id.* ¶ 48). He does not specifically identify what agreement entitled him to this interest, nor did he attach or incorporate by reference any such agreement, or quote from any such agreement in the text of his Complaint. He nonetheless alleges that, "As per *this agreement* . . . each unitholder's interest in . . . distributions of Defendant Fairdinkum Management was represented by the units owned by such unitholder." (*Id.* ¶ 49) (emphasis added). Plaintiff alleges that, between January 13, 2022 and June 7, 2023, the Fairdinkum Defendants failed to make certain distributions to which he was legally entitled pursuant to the unidentified "agreement" (*Id.* ¶¶ 50-51).

Plaintiff also alleges that he "would have been entitled to a deferred loan payment due to having sold certain shares of equity, which was around half of what he owned. Once a certain marker was due to hit, it would trigger repayment of the loan, which, upon information and belief occurred after his employment was terminated." (*Id.* ¶ 52).

Plaintiff does not plead how much he is owed as a result of Defendants' alleged failure to pay him monies owed, either the distributions or the deferred loan payment. Instead, he pleads that the "amount he is owed totals, upon information and belief, $73,489.96." (*Id.*)

While Plaintiff does not identify what contract is at issue in his pleading, Defendants do. There is a contract that entitles Plaintiff to a 9.722% interest in Fairdinkum Management Holdings LLC, and that entitles him, as a member of the LLC, to receive periodic distributions. That agreement is the September 17, 2021 LLC Agreement of Fairdinkum Management Holdings LLC (the "LLC Agreement"), to which Plaintiff is a signatory. (Dkt. No. 18-3, at 18-19). The LLC Agreement identifies the members of the LLC and sets out their proportionate ownership shares in the entity, which "this agreement" is alleged (at Am. Compl. ¶ 49) to do. The LLC Agreement also governs such matters as distributions of cash flow to the LLC's partners, as well as setting out how a Member could withdraw – voluntarily or involuntarily – and how the Company might go out of business and wind up its affairs. The LLC Agreement makes reference to a second agreement, the Operating Agreement, of even date; but while Plaintiff briefly mentions the Operating Agreement in his Complaint, (Am. Compl. ¶ 49), neither party has attached the Operating Agreement to any pleading or moving paper or identified any provision of an Operating Agreement that might be pertinent to the breach of contract alleged in the Complaint.[2]

---

[2] Plaintiff's reference to an Operating Agreement comes in the "Breach of Contract" section of his First Amended Complaint: "By way of background, incidental to, and by virtue of, Plaintiff's employment with the Fairdinkum Defendants, Plaintiff held equity in Fairdinkum Management totaling 9,722 'units of membership interests' which

In moving to dismiss the Complaint, Defendant argues that all four of Plaintiff's claims are subject to arbitration pursuant to the arbitration provision in the LLC Agreement. (Dkt. No. 18, at 1-2). That arbitration provision reads:

> <u>Arbitration</u>. All claims, demands, disputes, controversies and differences that may arise between or among any Member, and/or the Company concerning any issue relating to the interpretation or enforcement of this Agreement or relating to the rights or liabilities of any Member, the Manager, and/or the Company under this Agreement shall be exclusively determined and settled under the rules of arbitration of the American Arbitration Association (the "AAA Rules"). The place of arbitration shall be in New York, NY. The tribunal shall consist of three (3) arbitrators to be appointed in accordance with the AAA Rules. Nothing contained in this Section 11.9 or elsewhere in the Agreement shall in any way deprive any party of its right to obtain injunctive or other equitable relief in a court of competent jurisdiction.

(Dkt. No. 18-3 ¶ 11.9).

Plaintiff opposes Defendant's motion on the ground, *inter alia*, that the LLC Agreement is not the operative agreement pursuant to which he brings his lawsuit. Instead, he refers to some "other" unnamed agreement that should govern this dispute. (Dkt. No. 21, at 3). He does not identify what that "other" agreement is. I note that Plaintiff filed his opposition papers to the motion to dismiss and first raised the argument about some "other" agreement on November 29, 2024. This was weeks before the court-ordered deadline for filing an amended pleading.

On July 31, 2025, Plaintiff moved for leave to file a second amended complaint. (Dkt. No. 46). In that motion he identifies for the first time the "other" agreement that allegedly underlies his breach of contract claim. Plaintiff describes a February 25, 2022 email, about which he alleges the following:

> In the email dated February 25, 2022 from Defendant Lianos to Plaintiff, Lianos stated in relevant part, "Deerpath's recently executed transaction for 40% equity of Fairdinkum

---

equaled 9.722% of the aggregate membership interests in Defendant Fairdinkum Management. As per this agreement (which includes any and all amended and restated operating agreements—including but not limited to the Second Amended and Restated Operating Agreement dated as of September 7, 2021), each unitholder's interest in, inter alia, distributions of Defendant Fairdinkum Management was represented by the units owned by such unitholder." (Am. Compl. ¶¶ 48-49). In other words, Plaintiff alleges that the operating agreement was included in "this agreement."

Consulting, LLC was purchased for $1.15M, which means that the remaining 60% (which is now held by Fairdinkum Management Holdings)…For your reference, you own 9.722% of Fairdinkum Management Holdings. This February 25, 2022 email which was an offer to Plaintiff to purchase his member interests in Consulting further stated, "Additionally the company had taken out a Deerpath loan that was partially distributed. There is $73,489.96 earmarked for you of the remaining undistributed proceeds, so it's only fair to add that value on top which brings your total to $241,194.46."

(*See* Dkt. No. 46-1 ¶¶ 72-73).[3]

Plaintiff contends that he "relied on" this email in order to execute a member purchase agreement in or about June 6, 2023; he understood the email to indicate that his "interests [in the Company] would be purchased for approximately $167,704.50" and that he "would later receive his deferred loan proceeds of $73,489.96." (*Id.* ¶ 74). He alleges that he did not receive the $73,489.96 in deferred loan proceeds that were earmarked for him. (*Id.* ¶¶ 75-76). Plaintiff does not allege whether, or how much, he was paid for the sale of his membership interests in the Company.

In addition to identifying the previously unidentified "agreement," Plaintiff's Motion for Leave to Amend seeks to assert three additional causes of action – for fraud in the inducement; breach of fiduciary duty, misappropriation and self dealing; and constructive trust / unjust enrichment – all of which arise out of the alleged breach of the contract allegedly created by the February 2022 email.

## DISCUSSION

Although Defendant filed a Motion to Dismiss, "a motion to dismiss based on an arbitration agreement may be treated as a motion to compel arbitration." *Zachman v. Hudson Valley Fed.*

---

[3] In addition to the inconsistent quotation marks that make this passage particularly difficult to understand, Plaintiff appears to be misconstruing his alleged 9.722% interest in Fairdinkum Management Holdings LLC with some "member interests in Consulting." Based on the excerpt of the email that Plaintiff provides, any prior interests in Fairdinkum Consulting, LLC would appear to have been converted to interests in Fairdinkum Management Holdings LLC. This is consistent with Plaintiff's consistent allegation that he had a 9.722% interest in Fairdinkum Management Holdings LLC.

*Credit Union*, 49 F.4th 95, 100 n.3 (2d Cir. 2022); *see also Wabtec Corp. v. Faiveley Transp. Malmo AB*, 525 F.3d 135, 139-40 (2d Cir. 2008). Defendant's motion satisfies the standard of "explicitly or implicitly ask[ing] the court to order arbitration," *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) – indeed, Defendant makes no argument other than in relation to arbitration (it does not argue, for example, that any of the claims pleaded in the Amended Complaint fail to satisfy the *Twombley/Iqbal* pleading standard of Rule 12(b)(6) and so are dismissible for failure to state a claim on which relief may be granted). Therefore, I will treat the motion as a Motion to Compel Arbitration, and I will refer to it accordingly.

## I.     Defendant's Motion to Compel Arbitration of Plaintiff's Breach of Contract Claim (Count Four) Is Granted

Plaintiff's breach of contract claim (Count Four) is subject to arbitration, so to that extent, the Motion to Compel Arbitration is granted.

Per the terms of the LLC Agreement, the Company was formed upon the filing the certificate of incorporation with the Secretary of State of Delaware on September 10, 2021. The Complaint alleges that the Company was created in or around August or September 2021 following the merger of Fairdinkum Consulting, LLC and a company called Deerpath Capital – or "at minimum," Plaintiff says, after "Deerpath Capital purchased a significant portion of Fairdinkum Consulting." (Am. Compl. ¶ 13).

On or about September 17, 2021, the parties, including Plaintiff, executed an LLC Agreement, which states that it "define[s] and express[es] the terms and conditions pursuant to which the business and affairs of the Company will be operated." (Dkt. No. 18-3, at 1). Those terms and conditions include the identification of members and their respective shares in the LLC; the Members' right to distributions; and how those distributions are to be calculated and paid.

Plaintiff alleges in Count Four that the Company and its predecessor corporation, Fairdinkum Consulting LLC, have breached their obligation to make payment of distributions that he is owed by virtue of his 9.722% interest in the Company. However, any such obligation is plainly governed by the express terms of the September 2021 LLC Agreement. That agreement contains an arbitration clause, which covers "All claims, demands, disputes, controversies and differences that may arise between or among any Member, and/or the Company concerning any issue relating to the interpretation or enforcement of this Agreement or relating to the rights or liabilities of any Member, the Manager, and/or the Company under this Agreement." (Dkt. No. 18-3 ¶ 11.9). This breach of contract dispute is certainly a "claim, demand, dispute controversy or difference" between a Member (Plaintiff) and the Company concerning the enforcement of Plaintiff's rights under the Agreement. Plaintiff does not deny the existence of the LLC Agreement or the fact that it contains an arbitration clause. It would appear, therefore, that this is an open and shut case – the breach of contract claim must go to arbitration.

Plaintiff tries to avoid the obvious by asserting that "the contract Plaintiff alleges Fairdinkum Holdings breached" is not the LLC Agreement, but is some other agreement. (Dkt. No. 21, at 3). For this reason, Plaintiff argues that the disbursements Defendants allegedly withheld "are governed specifically by a separate document," and therefore, "the Arbitration clause in said [LLC] [A]greement is irrelevant to the instant breach of contract claim." (*Id.*).

But in his November 2024 opposition to the Motion to Compel Arbitration, Plaintiff conveniently fails to identify what that "separate document" is, when it was entered into, or by whom. In order to plead plausibly that such a separate agreement exists – or to convince the Court that the arbitration agreement in the LLC Agreement does not govern the instant contract dispute – Plaintiff would need to plead facts tending to show that a separate agreement governing the exact

same subject matter as the LLC Agreement was reached on a subsequent date. If indeed Plaintiff was relying on some other "agreement" in bringing his breach of contract claim, both he and his lawyer had to have known about that alternative arrangement at the time suit was filed – or, at the very latest, by the time he represented to the Court that he was relying on an agreement other than the LLC Agreement in bringing his Fourth Cause of Action.  But there is no allegation in the First Amended Complaint, and not a scintilla of evidence in the papers filed in opposition to the Motion to Compel Arbitration, that the parties to the LLC Agreement made any agreement after September 2021 that superseded the comprehensive LLC Agreement in terms of entitling Plaintiff to distributions. Indeed, the Amended Complaint turns out to be quite clear about which agreement entitled him to distributions; as noted above, "this agreement" is the agreement that sets out "each unitholder's interest in . . . distributions of Defendant Fairdinkum Management . . . represented by the units owned by such unitholder." (*Id.* ¶ 49). The only such agreement in the record before this Court is the  LLC Agreement.

Moreover, even if there were some subsequent agreement that entitled Plaintiff to additional payments in his capacity as a Member of the Company (and none is presently pleaded), in order to avoid the arbitration clause in the LLC Agreement, Plaintiff would have to convince this Court that he and the Defendants agreed to revoke remedy of arbitration in that subsequent agreement. For while "contracting parties are free to revoke an earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly preclude arbitration," *Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011), in order "to revoke an agreement to arbitrate, the superseding contract must 'stand[] in direct conflict' with the arbitration provision in the first agreement." *Hickey v. Smith*, 2025 WL 692052, at *8 (S.D.N.Y. Mar. 3, 2025); *see also Mina v. Foot Locker, Inc.*, 2009 WL 3241551, at *2–3 (S.D.N.Y. Sept. 30,

2009). It is well settled that the mere absence of an arbitration clause in a subsequent agreement "is not proof that the parties intended to foreclose arbitration." *Foot Locker, Inc.*, 2009 WL 3241551, at *3.

Neither in his opposition to the Motion to Compel Arbitration nor in his subsequent Motion for Leave to Amend does Plaintiff point to any superseding agreement containing language that stands in "direct conflict" with the arbitration provision in the LLC Agreement, or that purports to revoke that provision for resolving disputes between and among the Company and its Members, or between Members, relating to the affairs of the Company. A plaintiff who signed an arbitration agreement must do far more than say, "I am relying on some contract other than the LLC Agreement to undergird my claim." He must both offer evidence of what that contract is and demonstrate that it either revokes the arbitration clause contained in the contract that first gave rise to his right to distributions or deals with matters beyond the scope of the LLC Agreement. Plaintiff has done nothing of the sort. Instead, in his Fourth Cause of Action, he seeks payment of unpaid distributions to which he is entitled by virtue of his membership interest in the Company. Such matters are governed by Article 6 of the LLC Agreement. The arbitrability of Count Four could not be clearer.

In sum, the Fourth Cause of Action is, in this case, a dispute about the payment of distributions due pursuant to the LLC Agreement – which provides that distributions of net cash flow "shall be made to the Members in proportion to their respective Percentage Interests, taking into account the Members' varying interests for any relevant period." (Dkt. No. 18-3 ¶ 6.1). Plaintiff alleges that he did not receive the distributions he was due as a 9.722% Member of the Company. (*See* Am. Compl. ¶ 48). That dispute – and any other dispute he might have about payments he was due in his capacity as a Member of the Company, or in relation thereto – is

covered by the express terms of the arbitration clause in the LLC Agreement. So the dispute pleaded in Count Four must be arbitrated.

## II.    Plaintiff's Motion for Leave to File a Second Amended Complaint to "Clarify" the Nature of His Breach of Contract Claim, and to Add Alternative Theories of Recovery, Is Denied

Plaintiff's Motion for Leave to File a Second Amended Complaint in order to cure the deficiencies described above, and to add claims based on alternative theories of why he is owed money by the Company, is denied for two reasons. First, the motion is made far too late. The deadline for moving to amend pleadings was January 3, 2025 and he did not move until July 31, after the Motion to Dismiss was submitted for decision, and Plaintiff has not demonstrated good cause for waiting so long. Second, his proposed Second Amended Complaint does not allow him to avoid arbitration.

As to the former ground: A district court does not abuse its discretion in denying leave to amend pleadings after a court-ordered deadline has passed where the moving party has failed to establish good cause. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). Plaintiff has not established good cause for his delay in seeking leave to amend.

Plaintiff seeks to cure his failure to allege what contract was breached (which failure was discussed above) by adding information about an email that was sent to him on February 25, 2022 – an email that, he contends, entitles him to the payment of certain monies, including distributions and a portion of a loan repayment. However, (i) Plaintiff was in possession of this email almost three years before the January 3, 2025 deadline for amending his pleading; (ii) Plaintiff executed the member purchase agreement that he pleads in June of 2023 – a year and a half before that deadline; and (iii) Plaintiff represented to the court in November 2024, in his opposition to the Motion to Compel Arbitration, that he was relying on "some other agreement" than the LLC

Agreement for his claim of breach. Therefore, it is quite obvious that Plaintiff was aware of the basis for his breach of contact claim long before he filed this lawsuit, and long before he advised the Court that he was relying on some unidentified "other agreement" to avoid being sent to arbitration. That means there is absolutely no excuse for his failure to seek leave to file a second amended complaint prior to the January 2025 deadline imposed by the court.

And Plaintiff offers no credible excuse whatsoever for his failure to do that. Frankly, he could not possibly have done so.[4] The argument that any failure to previously identify this contract "was in part because [Plaintiff] did not have the benefit of Defendant Lianos' deposition testimony that clarified the agreement breached," (Dkt. No. 46, at 4), is utter nonsense. Plaintiff represented to the Court weeks prior to the deadline for amending pleadings that he was relying on some agreement other than the LLC Agreement. Plaintiff could not have made that representation without knowing exactly what "agreement" he was talking about. Lianos' testimony did nothing to clarify what Plaintiff had in mind when he filed suit.

Second, the proposed amendment is futile because the three new causes of action that Plaintiff proposes to add to his pleading – the proposed fifth, sixth, and seventh causes of action – all fall squarely within the arbitration clause in the LLC Agreement. The proposed new claims allege that Plaintiff was fraudulently induced to sell his shares by virtue of representations in the February 25, 2022 email; that Defendants Hafke and Lianos breached their fiduciary duties to Plaintiff in connection with that sale; and that Defendants were unjustly enriched by virtue of the share sale that was made in reliance on statements in the email about the value of Plaintiff's

---

[4] I remind Plaintiff and his attorney that the attorney was required to be aware of the factual basis for every allegation in the pleading at the time the attorney signed it. If for some reason the attorney was unaware of the identity of the agreement that he represented to be the contract that was breached, then the attorney is in gross violation of his obligations under Fed. R. Civ. P. 11.

interest. All of these claims arise out of and relate to the relationship between and among the Company and its members and Plaintiff (who is also a member); every one of them deals with the arrangement that the Plaintiff made to sell his shares in the Company. The LLC Agreement specifically deals with sales of interests in the Company; indeed, the entirety of Article 7 of the LLC Agreement is dedicated to the "Transfer of Membership Interests." (Dkt. No. 18-3 at 10-13). And a fair reading of the February 25, 2022 email indicates that Lianos is explaining to Plaintiff how much he is entitled to receive by virtue of his 9.722% interest in Fairdinkum Holdings. Therefore, the causes of action pleaded in the proposed Second Amended Complaint are just as arbitrable as is Plaintiff's original breach of contract claim.

Of course, if something in a subsequent document revoked the arbitration clause, Plaintiff would not need to arbitrate. But needless to say, Plaintiff points to no language that is in "direct conflict" with the arbitration provision in the LLC Agreement. Plaintiff points to no language in either the February 2022 email or the June 2023 member interest purchase agreement that revokes the previously-agreed arbitration clauses, or for that matter that mentions dispute resolution at all.

Plaintiff tries to avoid arbitration by adding to the proposed Second Amended Complaint two paragraphs alleging the existence of a purported September 8, 2021 Loan Agreement between Fairdinkum Consulting, LLC and Deerpath Capital. In this Loan Agreement, Plaintiff contends, there is a provision laying venue in this court for "any litigation arising out of or in connection with the loan documents and the obligation," (Dkt. No. 46-1 ¶¶ 14-15). But the venue provision in the loan documents would bind only the parties to the loan, and Plaintiff does not allege that he was either the borrower or the lender under those documents, or that he had standing to bring suit on the loan agreement to which he was not a party. It may be that this loan has something to do with Plaintiff's newly-asserted claim that he is entitled to a payment of a portion of the proceeds

from some loan. But even if it does, any failure to pay Plaintiff his proportionate share of the loan repayment proceeds derives, not from the loan documents, but from his membership interest in the Company. Therefore, his claim does not "aris[e] out of or in connection with *the loan documents and the obligation.*" (*Id.*) (emphasis added). Any claim that the Company failed to pay Plaintiff what he, as a Member of the Company, was entitled to receive upon repayment of any loan is governed by Article 6 of the LLC Agreement, not by the loan documents. And the LLC Agreement contains a binding arbitration clause.[5]

Whether Plaintiff's contract claims ultimately arise from the original contract (the LLC Agreement, which entitles him to distributions in proportion to his interest in the Company) or from some amendment or addition to that contract (the February 2022 email or the June 2023 member interest purchase agreement) is of no moment. The disputes identified by Plaintiff all involve the relations between an LLC Member in his capacity as an LLC Member and the Company. Any such dispute must be arbitrated, no matter how it arose. If Plaintiff wishes to add claim arising out of the sale of his membership interest to his original breach of contract claim pleaded in Count Four, he should address his request to the arbitrator.

### III.  Defendant's Motion to Dismiss or to Compel Arbitration is Denied with Respect to Plaintiff's Employment Discrimination Claims (Count 1-3)

Plaintiff also brings claims against Defendants under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., New York State Executive Law § 296, and New York City Administrative Code § 8-107(1). (*See* Am. Compl. ¶¶ 53-62). Defendant devotes less than half of a page of its Motion to Dismiss to these claims, arguing only that that these claims too are subject

---

[5] Plaintiff also does not explain how the venue provision in a September 8, 2021 Loan Agreement, to which he was not party, would take precedence over the arbitration provision in the September 17, 2021 LLC Agreement, to which he *is* a party.

to arbitration under the LLC Agreement. (*See* Dkt. No. 18-1, at 9). Defendant's primary argument is that that "Holdings LLC does not employ any individuals and, has certainly, never employed Plaintiff," (*id.*), and therefore Plaintiff's claims must "relat[e] to the rights or liabilities of any Member . . . , and/or the Company under [the LLC] Agreement," (Dkt. No. 18-3 ¶ 11.9).

But Plaintiff disagrees, citing to case law in this district to the effect that employees are required to arbitrate discrimination claims only where the arbitration clause specifically "placed the employee plaintiff on notice that he or she was waiving his or her right to bring employment discrimination claims in the federal courts." *Hoffman v. Aaron Kamhi, Inc.*, 927 F. Supp. 640, 644 (S.D.N.Y. 1996). For instance, in *Cronas v. Willis Group Holdings Ltd.*, Judge Lynch held that an arbitration agreement requiring "that any dispute arising either under this Agreement or from the employment relationship shall be resolved by arbitration," (Herbst Decl. Ex. 4, at ¶ 5, 06-cv-15295 (S.D.N.Y. Mar. 21, 2007), ECF No. 13), did not subject plaintiff's anti-discrimination claims – brought under Title VII of the 1964 Civil Rights Act and related state and city laws – to mandatory arbitration. 2007 WL 2739769, at *12 (S.D.N.Y. Sept. 17, 2007). Specifically, Judge Lynch emphasized that "the arbitration clause did not put Cronas on notice that she was waiving her right to pursue claims of employment discrimination in federal court," where "The phrase 'arising under this Agreement' is not defined in the clause, and none of the provisions of the Agreement make reference to the civil rights statutes or to discrimination claims generally." *Id.*, at *11; *see also Rompalli v. Portnova*, 2010 WL 2034396, at *5 (S.D.N.Y. May 5, 2010*), report and recommendation adopted*, 2010 WL 2034362 (S.D.N.Y. May 21, 2010) ("Generally, employment discrimination claims fall within the scope of an arbitration clause as long as the word 'discrimination' is mentioned.").

The same can certainly be said of the arbitration clause in the LLC Agreement. This clause applies to "All claims, demands, disputes, controversies and differences that may arise between or among any Member, and/or the Company *concerning any issue relating to the interpretation or enforcement of this Agreement* or relating to the rights or liabilities of any Member, the Manager, and/or the Company *under this Agreement*." (Dkt. No. 18-3 ¶ 11.9) (emphasis added). As in *Cronas*, the phrases "relating to the interpretation or enforcement of this Agreement" and "under this agreement" appear to relate solely to the matters that are comprehended in the LLC Agreement – matters relating to membership, capital contributions, governance, distributions, withdrawal from membership, and termination/dissolution. None of those things has to do with employment, whether by the Company of by one of its members. Although there is a brief mention in the LLC Agreement of the possibility that "members" of the LLC might also be "employees" of Fairdinkum Management Holdings LLC or Fairdinkum Consulting, LLC, (Dkt. No. 18-3 ¶¶ 5.8(c); 9.1(c)(iv)-(v)), the concept of employment is not comprehended in the substantive provisions of the LLC Agreement and is not referenced *at all* in the arbitration clause. In light of *Cronas*, I cannot say that the arbitration clause is drafted in a way that would put an employee of Fairdinkum on notice that he or she has agreed to waive employment discrimination claims.

In its reply brief, Defendant argues that because any alleged employment relationship necessarily arose from and relates to Plaintiff's status as a member of the Company, any related claims are governed by the arbitration provision in the LLC Agreement. But Defendant's assertion is contradicted by certain well-pleaded allegations in Plaintiff's First Amended Complaint. Plaintiff claims that his employment with Defendants began in 2005. (*See* Am. Compl. ¶¶ 19-20). He alleges that he continued performing his job functions remotely at the beginning of the COVID-19 pandemic in March 2020, (*id.* ¶ 21), and that he received an accommodation to continue

working remotely in or around August 2021, (*id.* ¶¶ 23-26). It was allegedly the revocation of an accommodation that was granted well before the signing of the LLC Agreement in September 2021 that led Plaintiff to allege employment discrimination.

The First Amended Complaint, therefore, clearly alleges some type of employment relationship between Plaintiff and Defendants that long preceded, and therefore could not have arisen in connection with the formation of the Company and the signing of the Agreement that Plaintiff entered into in September 2021. What's more, the LLC Agreement includes no terms that would govern an employee-employer relationship – such as an employee's wages, hours, job responsibilities etc. It therefore does not pass muster to say that any employment relationship between Plaintiff and Defendants necessarily arose from or relates to Plaintiff's status as a Member under the LLC Agreement.

Of course, the fact that Plaintiff pleads an employment relationship that predates the formation of the Company does not make it so. It is simply an allegation that, at this moment, I must assume to be true. If Plaintiff really was not employed by the Defendants on the first three causes of action, his claims will be dismissed. But in light of the well-pleaded allegations of the Complaint, that is an issue of fact to be determined at a later point in this case. And that decision will be made by a court of law – not by an arbitrator.

For these reasons, Plaintiff's first, second, and third causes of action are not subject to arbitration under the LLC Agreement, and the Motion to Dismiss or to Compel Arbitration is DENIED with respect to these claims.

## IV.    Plaintiff's Motion for Leave to Amend in Relation to His Discrimination Claims Is Denied

Finally, certain aspects of Plaintiff's Motion for Leave to File a Second Amended Complaint are addressed to adding additional factual allegations about his discrimination claims. That aspect of the Motion for Leave to Amend is also denied.

First, it is denied because, as noted above, his motion was brought on July 31, 2025 – almost seven months after briefing on the Motion to Dismiss had concluded and six months after the Court-endorsed deadline to amend pleadings or join new defendants. For that reason alone, I would choose to deny it. And as noted above (*see supra*., pg 11), I would be well within my rights to do so.

Moreover, I am not inclined to conclude that Plaintiff is acting in good faith by proposing this amendment, since his and his attorney's conduct in connection therewith demonstrate sharp litigation tactics. Plaintiff's Motion for Leave to File a Second Amended Complaint states that the motion should be granted because counsel for Defendants was provided a redline of the proposed Second Amended Complaint and failed to object before Plaintiff's motion was filed – suggesting that the motion was unopposed. (Dkt. No. 46, at 1). But, as it turns out, Plaintiff gave Defendants only three hours between when he sent the proposed Second Amended Complaint – which was over twice the size of the original complaint – and when he filed his motion. (Dkt. No. 47-1, at pdf pg. 5). This does not sit well with the Court.

But of greater importance, amendment is unnecessary. Nearly all of the additional material Plaintiff proposes to add to his First Amended Complaint concerning his discrimination claims is simply evidence that has been developed during discovery. These new evidentiary allegations are obviously intended to bolster the more conclusory allegations made in earlier versions of his

pleading. But that is entirely unnecessary; Plaintiff has pleaded sufficient facts to survive any motion to dismiss Counts One, Two, and Three in the First Amended Complaint pursuant to Rule 12(b)(6). The merits of the case will not be decided on the basis of the pleadings (indeed, the trier of fact will never see Plaintiff's pleading, unless it is used to impeach his credibility). We have a notice pleading scheme, and the First Amended Complaint gives the Defendants ample notice of the basis for Plaintiff's claims of discrimination.

The only aspect of Plaintiff's motion that bears greater scrutiny is his request to be allowed to add a new defendant to this action. But that request, too, is both untimely and futile.

In the proposed Second Amended Complaint, Plaintiff alleges that Josh Christensen "reported Plaintiff to Defendant Hafke without notice or inquiry that Plaintiff failed to report his COVID 19 symptoms or lack thereof prior to a client visit in New Jersey *with full knowledge that Plaintiff would suffer an adverse employment action* and did in fact suffer suspension and thereafter discharge based on Defendant Christensen's conduct or actions and thereby aided and abetted Defendant Hafke and Consulting to take adverse employment actions against Plaintiff based on his disability and/or in retaliation for him obtaining an accommodation." (Dkt. No. 46-1 ¶ 118) (emphasis added). Although Plaintiff claims that the late addition of Christensen is justified because Plaintiff did not previously "understand" the "causal" role that Christensen played in his termination, the proposed addition of Christensen would nevertheless be futile under NYSHRL Section 296(1) (Count Two) and NYCHRL Section 8-107(1) (Count Three) because Christensen's actions, as pleaded, are insufficient to allege liability under these statutes.[6]

---

[6] Individual managers like Christensen are not "employers" and may not be sued for disability discrimination under the ADA. *See Legrá v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, 2016 WL 6102369, at *2 (S.D.N.Y. Oct. 19, 2016).

Under Section 296(1) the NYSHRL, "an employee may not be individually subject to suit as an employer . . . if he or she is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 554 (S.D.N.Y. 2014) (cleaned up). Plaintiff never alleges that Christensen was an employer, had an ownership interest in the Company, or had the ability to make personnel decisions himself. For that reason, he cannot be liable under NYSHRL § 296(1), so adding a New York State law claim against Christensen would be futile.

And although "Under the NYCHRL, there is a broader basis for direct individual liability than under the NYSHRL, such that employees may be held liable regardless of ownership or decisionmaking power . . . . As with the NYSHRL, however, liability . . . is limited to those individual employees who *actually participated* in the conduct giving rise to plaintiff's claim." *Khwaja v. Jobs To Move Am.*, 2021 WL 4927140, at *20 (S.D.N.Y. Mar. 26, 2021) (emphasis added, internal citations omitted). In the proposed Second Amended Complaint, Christensen is not alleged to have fired Plaintiff or to have participated in making the decision to fire Plaintiff. He is only alleged to have reported that Plaintiff was out of compliance with relevant COVID-19 policies and practices – reporting which Plaintiff acknowledges fell within Christensen's job responsibility – with knowledge that this information might have negative repercussions for the Plaintiff. But the fact Christensen knew Plaintiff's refusal to get vaccinated might have resulted in his termination does not mean that he "actually participated" in the discriminatory acts alleged by Plaintiff – which discriminatory act was firing him. The allegations in the proposed Second Amended Complaint

are too thin a reed to support any contention that Christensen participated in Plaintiff's discriminatory termination as a matter of law. [7]

## V.    Litigation Concerning Count 4 is Stayed Pending Arbitration

Chapter 1, Section 3 of the Federal Arbitration Act states that "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement*, providing the applicant for the stay is not in default in proceeding with such arbitration. 9 U.S.C. § 3 (emphasis added). In the recent Supreme Court decision, *Smith v. Spizzirri*, the Court held that the "statute's use of the word 'shall' creates an obligation impervious to judicial discretion." 601 U.S. 472, 472 (2024) (internal quotations omitted).

In this case, Plaintiff has requested that, if I do not deny Defendant's Motion to Dismiss in its entirety, "this Court should . . . compel arbitration and stay so much of the action against Fairdinkum Holdings." (Dkt. No. 47, at 1). I will stay further proceedings on Plaintiff's fourth cause of action, for breach of contract, pending the conclusion of arbitration, or until further order from this Court. I do not stay proceedings in connection with his first three causes of action for employment discrimination – the claims in connection with which Defendant's Motion to Compel Arbitration (styled as a Motion to Dismiss) was denied. The parties are directed to submit a Case

---

[7] Even if I were to construe the causes of action in the Second Amended Complaint as relying on the aiding and abetting liability provisions of New York State and New York City discrimination law – sections 296(6) and 8-107(6), respectively – Christensen could still only "be held liable for aiding and abetting violations of NYCHRL and NYSHRL if he participate[d] directly in discriminatory acts alleged by the Plaintiff." *Cloke-Browne v. Bank of Tokyo-Mitsubishi UFJ. Ltd.*, 2011 WL 666187, at *27 (S.D.N.Y. Feb. 9, 2011).

Management Plan or to request that a Rule 16 conference be scheduled within 30 days of the date of this decision.

## CONCLUSION

Defendant's Motion to Dismiss is construed as a Motion to Compel Arbitration. It is GRANTED as to Count 4 and DENIED as to Counts 1, 2 and 3. Plaintiff's Motion for Leave to File a Second Amended Complaint is DENIED. Plaintiff's motion for a stay pending arbitration is GRANTED as to Count 4. The case will not be stayed as to Counts 1, 2, and 3.

This is a written decision and it constitutes the decision and order of the court. The Clerk of Court is directed to remove the motions located at Docket Numbers 18 and 46 from the Court's list of open motions.

Dated: September 5, 2025

_____
U.S.D.J.